VINSON & ELKINS LLP
Matthew J. Jacobs (CSB 171149)
  Email: mjacobs@velaw.com
Christopher James (CSB 289047)
  Email: cjames@velaw.com
555 Mission Street, Suite 2000
San Francisco, CA  94105
Telephone: 415.979.6900
Facsimile: 415.651.8786

Attorneys for Defendant
MICHAEL SANDY ABADILLA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br> v.<br><br>MICHAEL SANDY ABADILLA,<br><br>      Defendant. | No.  19-cr-00072-VC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Hearing Date:  May 10, 2021<br>Time:  10:00 a.m.<br>Dept.:  Courtroom 12, 19th Floor<br>Judge:  Hon. Vince Chhabria |

**REDACTED PUBLIC VERSION**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ...............................................................................................3

    A.    Mr. Abadilla's Background & Personal History .............................................3

    B.    Mr. Abadilla's DIY Pistol Hobby .................................................................4

    C.    The Instant Offense .....................................................................................4

III.    APPLICABLE SENTENCING GUIDELINES CALCULATION ....................6

IV.     THE SECTION 3553(A) FACTORS WARRANT A DOWNWARD
      VARIANCE FROM THE APPLICABLE SENTENCING GUIDELINE
      RANGE. ...........................................................................................................7

    A.    History & Characteristics of the Defendant, and Associated Policy
        Statements ...................................................................................................8

        1.    No Criminal History.........................................................................9

        2.    Mr. Abadilla's Responsibilities as Caretaker and Provider for His
            Wife...........................................................................................10

    B.    Nature and Circumstances of the Instant Offense....................................11

    C.    Sentencing Options .....................................................................................12

    D.    Specific and General Deterrence, and Public Safety .................................13

V.      CONCLUSION.................................................................................................14

## TABLE OF AUTHORITIES

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ....................................................................................................8, 13

*Nelson v. United States,*
    555 U.S. 350 (2009) ........................................................................................................7

*United States v. Ahedo-Aguilar,*
    809 F. App'x 413 (9th Cir. 2020) ...................................................................................8

*United States v. Arreola-Bretado,*
    445 F. Supp. 3d 1154 (S.D. Cal. 2000) ..........................................................................9

*United States v. England,*
    No. CR 18-61-GF-BMM, 2020 WL 4004477 (D. Mont. July 15, 2020) ......................11

*United States v. Hardy,*
    289 F.3d 608 (9th Cir. 2002) ...........................................................................................7

*United States v. Husein,*
    478 F.3d 318 (6th Cir. 2007) .........................................................................................10

*United States v. Mishler,*
    No. 19-cr-00105-RS-2, 2020 WL 3791590 (N.D. Cal. July 7, 2020)...........................14

*United States v. Myers,*
    353 F. Supp. 2d 1026 (S.D. Iowa 2005) ..........................................................................9

*United States v. Panyard,*
    No. 07-20037, 2009 WL 1099257 ( E.D. Mich. Apr. 23, 2009).....................................13

*United States v. Paul,*
    239 Fed. Appx. 353 (9th Cir. 2007) ................................................................................9

*United States v. Paul ("Paul II"),*
    561 F.3d 970 (9th Cir. 2008)...........................................................................................9

*United States v. Rangel,*
    697 F.3d 796 (9th Cir. 2012)..........................................................................................10

*United States v. Robinson,*
    No. 18-CR-00597-RS-1, 2020 WL 1982872 (N.D. Cal. Apr. 27, 2020) ......................13

*United States v. Working,*
    224 F.3d 1093 (9th Cir. 2000).........................................................................................9

*United States v. Zukerman,*
    451 F. Supp. 3d 329 (S.D.N.Y. 2020) ...........................................................................14

**Statutes**

18 U.S.C. § 921(a) .................................................................................................................7

18 U.S.C. § 3551 .................................................................................................................12

18 U.S.C. § 3553 ...........................................................................................................passim

18 U.S.C. § 3553(a) .......................................................................................................passim

18 U.S.C. § 3561(a) .............................................................................................................12

18 U.S.C. § 3561(c) .............................................................................................................12

18 U.S.C. § 3563(b)(19).......................................................................................................12

18 U.S.C. § 3583 .................................................................................................................12

26 U.S.C. § 5845(b) ................................................................................................................ 7

**Other Authorities**

H.R. Rep. No. 495 (1986), *reprinted* 1990 U.S.C.C.A.N. 1327 ............................................. 1

U.S.S.G. § 2K2.1 ............................................................................................................ 8, 13

U.S.S.G. § 2K2.1, Application Note 1, Definitions ................................................................ 7

U.S.S.G. § 2K2.1, Historical Notes, Amendment 669 (Nov. 1, 2004) ................................... 7

U.S.S.G. § 2K2.1(b) .............................................................................................................. 7

U.S.S.G. § 2K2.1(b)(1) ......................................................................................................... 6

U.S.S.G. § 2K2.1(b)(1)(A) .................................................................................................... 7

U.S.S.G. § 2K2.1(b)(2) ..................................................................................................... 3, 12

U.S.S.G. § 5C1.1 ................................................................................................................. 12

U.S.S.G. § 5D1.1 ................................................................................................................. 12

U.S.S.G. § 5F1.2 ................................................................................................................. 12

U.S.S.G. § 5H1.6 ............................................................................................................ 8, 10

U.S.S.G. § 5H1.6, Application Note 1(B) ............................................................................ 10

U.S.S.G. § 5K2.20 ............................................................................................................. 8, 9

United States Sentencing Commission,
    *Recidivism Among Federal Firearms Offenders* (June 2019) ................................. 9, 13

132 Cong. Rec. 9555 (1986) .................................................................................................. 1

DEFENDANT'S SENTENCING MEMORANDUM
CASE NO. 19-CR-00072-VC

1    **I.    <u>INTRODUCTION</u>**

2         Michael Abadilla is deeply remorseful for his crime.  He made a terrible mistake when he

3    purchased conversion switches from the retail website Wish.com that, if installed on a pistol, would

4    be capable of enabling automatic fire.  However, it is important for the Court to understand the

5    circumstances of Mr. Abadilla's violation.

6         **First**, Mr. Abadilla is not a typical gun offender.  The legislative history of the Gun Control

7    Act makes clear that its purpose is to prevent violent criminals from getting hold of dangerous

8    weapons, not to target sportsmen and collectors.[1]  Mr. Abadilla is a former hospital worker with no

9    criminal history.  He has lived with his wife in the same one-bedroom, one-bath apartment in South

10   San Francisco for 27 years.  He has no gang affiliations, does not drink or do drugs, has never sold

11   firearms, and has never unlawfully used any firearm.  He has never even fired a gun outside of a firing

12   range.  Mr. Abadilla became interested in these parts and in guns generally as hobbyist who began

13   tinkering with do-it-yourself kits after he lost his job.  He lives with his wife, Maria Veronica, who

14   has a number of very serious medical conditions.  She suffers from ███████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████████.  PSR ¶¶ 42-43.  Mrs. Abadilla also suffers

17   from ███████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ██████████████████.  PSR ¶¶ 42-43.  Mr. Abadilla is her sole caregiver.

20        **Second,** Mr. Abadilla purchased these switches without knowing that they were illegal or

21   intending to break the law.  This is not a legal defense and he has readily admitted his culpability.

22   But his lack of intent is relevant to sentencing.  The switches were purchased from Wish.com, a

23

24   ───────────────────
     [1] *See* H.R. Rep. No. 99-495, 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing "the need for more
     effective protection of law enforcement officers from the proliferation of machine guns"); *id.* at

25   1330 (describing machineguns as "used by racketeers and drug traffickers for intimidation, murder
     and protection of drugs and the proceeds of crime"); *see also* 132 Cong. Rec. 9555, 9600-04 (1986)

26   (Statement of Sen. Hatch) (machinegun ban "designed to deal with crime guns," and overall aim of
     the act "to ensure the punishment of the real villains"—those "who use firearms to rob and

27   murder"); 99th Cong. 1, 109 (1986) (Statement of Rep. Hughes, Chairman of the Subcomm. on
     Crime) (emphasizing the need to keep "firearms out of the hands of felons," while distinguishing

28   "[l]aw-abiding hunters, sportsmen, and collectors").

DEFENDANT'S SENTENCING MEMORANDUM;
CASE NO. 19-CR-00072-VC

1    mainstream online retailer that advertises itself on the jerseys of the Los Angeles Lakers.  Wish.com's

2    product recommendation algorithm actually steered Mr. Abadilla to a listing for these switches.  PSR

3    ¶ 17 ("suggested for you").  There was no warning or indication on the listing that the items were

4    illegal in the United States.  They are described as a "DIY Component" (do-it-yourself) that was

5    "Verified by Wish Shoppers."  Mr. Abadilla, who was purchasing the items on a lark, had no idea

6    they were problematic.  He was so unaware of the illegality that he posted a public review indicating

7    that he couldn't get the switches to fit on his homemade firearms.  That posting is how law

8    enforcement agents located him.

9         **Third,** Mr. Abadilla never used the switches.  After he lost his job in 2015, Mr. Abadilla

10   picked up several hobbies—camping, archery, working on his car.  He did a lot of online shopping

11   (most often on Wish.com) for odd items: gold coins, necklaces, blood pressure cuffs, fishing tackle,

12   camping gear, wigs, and women's dresses, to name a few.  He started building pistols after seeing a

13   Facebook ad for do-it-yourself pistol kits.  He had no intention of using the weapons to commit

14   crimes; he just enjoyed tinkering with the kits to pass the time.  He only ever fired the pistols at the

15   Jackson Arms firing range, which closed in summer 2018 (months before he purchased the switches).

16   The $10 switches were supposed to fit onto his homemade pistols, but he could not figure out how to

17   install them.  All but one of the switches seized by the agents were still in their packaging.  So while

18   Mr. Abadilla possessed dangerous parts, he was never an actual danger to anyone.

19        **And fourth,** Mr. Abadilla was appalled when he learned that his purchase was illegal, and

20   that his ignorance might jeopardize his liberty and ability to care for his wife.  When the agents arrived

21   at his home, he cooperated and immediately directed them to his guns.  After the search was

22   completed, he turned in (through counsel) an additional switch that the agents failed to find during

23   the search.  PSR ¶ 13.  That cooperation is part of the reason the government is recommending a

24   sentence of a year and a day.  Plea ¶ 16.

25        Both the government and Probation Officer, recognizing that Mr. Abadilla does not fit the

26   profile of a typical machinegun offender, are recommending sentences below the Guidelines range.

27   The Guidelines provision that most closely fits Mr. Abadilla is the "sportsman and collectors"

28   exception for persons who illegally possess firearms but do not unlawfully discharge or otherwise use

-2-

them.  U.S.S.G. § 2K2.1(b)(2) (directing a decrease in offense level to 6, with 0-6 month sentencing range).  Mr. Abadilla does not quality for this provision because machinegun firearms are technically excluded. *Id*.  Nevertheless, the spirit of the Guideline is instructive as to potential treatment of those who are buying weapons (albeit possessing them illegally) for personal hobby or collecting purposes, rather than using them in connection with crime and violence.

The sad circumstances of Mr. Abadilla's situation, and particularly the dire state of his wife's health, weigh in favor of the Court's leniency.  We respectfully submit that no purpose is served by sending Mr. Abadilla to federal prison.  Mr. Abadilla's path to committing the instant crime is so unique that it is hard to imagine any deterrent effect from incarceration; the serious lessons from this case already provide a strong message to hobbyists who neglect to inform themselves of gun control laws.  Mr. Abadilla depleted the remainder of his severance pension on his defense before being transferred to court-appointed counsel.  His family is destitute.  Incarceration would not only prevent Mr. Abadilla from re-entering the workforce, but would have severe consequences for Mrs. Abadilla, who depends on Mr. Abadilla for care, particularly with the ongoing pandemic.  Because this is a Class C felony, and because he already spent eight days in custody, the Court has the option of imposing a sentence of home confinement either as a condition of Probation, or as part of a Supervised Release sentence based on time served.  The Court's sentencing options are described in more detail in Section IV.C below.

The Probation Office has recommended an eight month sentence.  PSR Sentencing Recommendation, at 1.  The Defense endorses the eight month sentence, but respectfully requests that the Court pronounce a judgment requiring Mr. Abadilla to serve that sentence in home confinement as a condition of Probation or Supervised Release.

## II.    BACKGROUND

### A.    Mr. Abadilla's Background & Personal History

Mr. Abadilla has lived his whole life in San Francisco.  He grew up in a modest household with his mother, stepfather, sister and three brothers.  PSR ¶¶ 37-38.  Mr. Abadilla struggled with traditional schooling and never graduated high school. PSR ¶ 53.  After his stepfather died of cancer, Mr. Abadilla lived with his mother until he was 27 years old, when he met his now wife Maria

1  Veronica.  PSR ¶ 42.  The two have been married for 27 years and have lived in the same one-

2  bedroom, one-bath apartment in Visitacion Valley since then.  PSR ¶ 42, 44.

3     Mr. Abadilla worked for UCSF Medical Hospital's supply warehouse from 2000 to 2015.

4  PSR ¶ 57. He managed supplies in the hospital's operating rooms.  PSR ¶ 57; *see* Declaration of

5  Christopher W. James in Support of Defendant's Sentencing Memorandum ("James Decl.") Exs. A,

6  B.  In 2015, UCSF went through an administrative transition and Mr. Abadilla was one of many senior

7  staff members forced into early retirement.  Mr. Abadilla was a member of the AFSCME 3299 union,

8  and as part of his retirement settlement he received a $200,000 IRA distribution.  PSR ¶ 57.

9     Mr. Abadilla began spending his days at home, caring for his wife, watching TV, and tinkering

10  on his car. PSR ¶ 45.  He embraced hobbies such as camping, archery, and air rifle target shooting.

11  PSR ¶ 17, 45.  Mr. Abadilla had never had access to these types of hobbies growing up, and felt like

12  he was making up for lost time.  He supported the family on withdrawals from his IRA severance.

13     **B.     <u>Mr. Abadilla's DIY Pistol Hobby</u>**

14     In 2017, Mr. Abadilla saw an advertisement on Facebook for learning how to build your own

15  do-it-yourself pistol.  PSR ¶ 17.  Mr. Abadilla had never owned or fired a firearm, but he enjoyed his

16  other target shooting hobbies and thought the mechanical process of building a hobby pistol seemed

17  interesting.  *Id.*  He watched a few YouTube videos and purchased tools and a DIY hobby kit for a

18  pistol from McGill's Glockstore in San Diego.  *Id.*; Plea Agreement ¶ 2.  His first attempts were

19  unsuccessful.  PSR ¶ 17.  He drilled holes in the wrong places, and had to start over multiple times.

20  *Id.*  But he gradually learned the steps from online tutorial videos, and assembled two standard sized

21  pistols from the McGill kits, and a smaller size pistol with pink accessories as a gift for his wife.  *Id.*

22     Mr. Abadilla has only ever fired his hobby pistols at a San Bruno shooting range called

23  Jackson Arms, which closed in 2018.  *Id.*  He never attempted to sell one of the firearms or any firearm

24  parts, or offered to assemble a firearm for anyone other than his wife.  *Id.*

25     **C.     <u>The Instant Offense</u>**

26     When Mr. Abadilla purchased the conversion switches on Wish.com, he had no idea they were

27  illegal.  *Id.*  Wish.com is an e-commerce platform, similar to Amazon and Ebay, where sellers from

28  around the world market products and sell directly to consumers.  It is not a "silk-road" type site that

1  caters to criminal activity or anonymous illicit purchasing.  The site was created by a former Google

2  engineer and is operated from San Francisco by the company ContextLogic, Inc.  PSR ¶ 7.  In 2018,

3  Wish.com was the most downloaded mobile shopping application worldwide and, as of 2019, was

4  the third largest e-commerce marketplace in the United States.[2]  Wish.com was even advertised on

5  the front of L.A. Lakers' jerseys beginning in 2017.  *Id.*

6        Mr. Abadilla used Wish.com frequently, mostly to purchase toys and everyday items: novelty

7  gold coins, necklaces, blood pressure cuffs, fishing tackle, camping equipment, night vision goggles,

8  a "spycam" pen camera, women's dresses and wigs, Halloween costumes, movie props, clock radios,

9  and archery equipment.  James Decl. ¶ 4.  He also purchased accessories and tools to support his

10  pistol hobby, such as magnification glasses to help see the small parts better and various scopes and

11  optical lenses that could attach to the pistols.  *Id.*

12        On December 21, 2018, Wish.com's "suggested for you" algorithm recommended the

13  conversion switches to Mr. Abadilla.  PSR ¶ 17.  He did not search for them, and had never even

14  heard of an automatic conversion switch.  Mr. Abadilla thought the switches looked "cool," and was

15  curious to tinker with them.  *Id.*  The parts were advertised as a "DIY component."  James Decl. Ex.

16  D.  Nothing about the listing indicated the conversion switches were illegal to purchase or possess in

17  the United States.  The advertisement included no warnings or disclaimers.  *Id.*  On the contrary, the

18  page includes a notation that the product was "Verified by Wish Shoppers," suggesting that Mr.

19  Abadilla could purchase the parts without concern.  *Id.*  Mr. Abadilla made no attempt to conceal his

20  purchase or identity—his Wish.com account is registered under his full name "Michael S Abadilla,"

21  which authorities linked to his Facebook account.  *See* James Decl. Ex. C.  Mr. Abadilla even posted

22  a public review on the seller's page.  James Decl. Exs. C, E.

23        Mr. Abadilla sought to purchase two switches for two pistols—the standard size pistols he

24  built from his DIY kits.[3]  PSR ¶ 17.  He attempted to purchase the items from one seller, but the

25  purchase was not immediately confirmed, leading him to believe the transaction had failed.  PSR ¶

26

27  [2] Wikipedia.org, Wish (Company) (April 5,2021), https://en.wikipedia.org/wiki/Wish_(company).

28  [3] The switches were not compatible for the smaller size pistol Mr. Abadilla built for his wife.  *See* James Decl. Ex. D (advertising compatibility with "G17" [Glock 17] pistols but not Glock 43 size).

-5-

1   17.  Mr. Abadilla attempted to make his purchase from a different seller, again selecting a quantity of

2   two.  Unknown to Mr. Abadilla at the time, each "quantity" selected from this seller included two

3   pieces.  *See* James Decl. Ex. G ("Size: 2pcs").  The second purchase processed immediately.  Forty

4   minutes later, Mr. Abadilla's purchase from the first seller processed, as well.  *See* James Decl. Ex.

5   F.  So while Mr. Abadilla only ever intended to purchase two switches, a total of six were ultimately

6   delivered to his home on or around January 1, 2019.  *See* James Decl. Exs. H, I.  Because the pieces

7   were so inexpensive ($10 apiece) and Mr. Abadilla had no idea that possession of the parts was

8   problematic, he did not return or discard the additional parts.  Plea Agreement ¶ 2; PSR ¶ 17.

9        Mr. Abadilla attempted to install only one of the switches, but could not get it to fit.  PSR ¶

10   17.  His Wish.com customer review reflects this: "Don't really quite fit but I make adjustments

11   delivery came pretty fast thank you."  James Decl. Ex. E.  Mr. Abadilla removed the switch and set

12   it aside with his other DIY parts.  PSR ¶ 17.  He never took the switches outside of his home and

13   never fired any pistol with a switch attached.  *Id.*  Mr. Abadilla never even removed the other switches

14   from their packaging.  *Id.*; James Decl. ¶ 12, Ex. J.

15        Law enforcement traced Mr. Abadilla's customer review to his home, and executed a search

16   warrant on January 16, 2019, only two weeks after the parts arrived.  Mr. Abadilla had no idea the

17   officers were looking for the switches.  PSR ¶ 17.  He cooperated fully with the officers, and directed

18   them to his hobby pistols and parts.  PSR ¶ 9-10.  Five of the six switches were discovered during the

19   search, still in their packaging.  *See* James Decl. Ex. J.

20        Mr. Abadilla was arrested, and spent eight days in custody.  PSR ¶ 5.  When he returned home

21   from his incarceration, he discovered that the officers had missed the sixth switch during their search.

22   PSR ¶ 17.  Through counsel, he voluntarily informed law enforcement authorities about the additional

23   switch and worked through counsel to have it recovered.  PSR ¶ 13; Plea Agreement ¶ 2.

24   **III.   APPLICABLE SENTENCING GUIDELINES CALCULATION**

25        There is one minor, technical issue in calculating the Guidelines, although (appropriately)

26   neither the government nor Probation Officer are seeking a Guideline sentence.  PSR, Objection

27   Number 1.  The Defense objects to the two-level enhancement under U.S.S.G. § 2K2.1(b)(1), for

28   offenses involving three to seven firearms. Plea Agreement ¶ 7(b); PSR ¶ 20; *see also* Plea Agreement

¶ 7 (reserving right to contest enhancement).  The Court should not count each individual conversion switch as a separate firearm for the purposes of this enhancement.

The definition of "firearm" applicable for the U.S.S.G. § 2K2.1(b) enhancement is provided by 18 U.S.C. § 921(a)(3).[4]  U.S.S.G. § 2K2.1, Application Note 1, Definitions.  That definition does not include the type of individual conversion switch part at issue here.  The only non-firing parts identified are frames, receivers, mufflers/silencers, and those used to make destructive devices (mines, grenades, etc.).  18 U.S.C. § 921(a)(3)-(4).  The "machinegun" definition is not cited for the enhancement.  *See also* U.S.S.G. § 2K2.1, Historical Notes, Amendment 669 (Nov. 1, 2004) (removing "machinegun" definition from the Application Notes definitions).  And the rule of lenity applies to ambiguities in the guidelines.  *United States v. Hardy*, 289 F.3d 608, 614 (9th Cir. 2002).[5]

And, as set forth above, Mr. Abadilla only intended to purchase two switches (not all six).  He only possessed the extra pieces as a result of mistake and technical error.  Applying an enhancement that would inflate his sentencing range by six months is unwarranted.  For these reasons, the 2-point enhancement under U.S.S.G. § 2K2.1(b)(1)(A) should be removed from Mr. Abadilla's Guidelines calculation, and the Court should find that the correct Adjusted Offense Level is 15.

## IV.    THE SECTION 3553(A) FACTORS WARRANT A DOWNWARD VARIANCE FROM THE APPLICABLE SENTENCING GUIDELINE RANGE.

All parties are in agreement that this is not a "Guidelines case."  *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are

---

[4] "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."  18 U.S.C. § 921(a)(3).

[5] Even if the "machinegun" definition of a firearm is used for the § 2K2.1(b) enhancement, the individual conversion switches do not separately qualify as "machineguns."  They only qualify in combination with the two G17 size pistols Mr. Abadilla had built.  26 U.S.C. § 5845(b) (a combination of parts from which a machinegun can be assembled).  Because Mr. Abadilla was only capable of assembling two machineguns from the parts in his possession, the enhancement is unwarranted.  It is true that under certain circumstances individual parts can qualify as machineguns, but only if they are found to be "designed and intended ***solely and exclusively*** … for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b) (emphasis added).  The switches Mr. Abadilla purchased have never been determined to have such a "sole and exclusive" design, and  Mr. Abadilla's plea agreement does not admit as much.  *See* Plea Agreement ¶ 2.  The PSR's description of the conversion switches similarly lacks the necessary "solely and exclusively" designation.  *See* PSR ¶ 11; Addendum to PSR ¶ 4.

1  also not to be *presumed* reasonable.") (original emphasis).  Both the government and Probation Office

2  are recommending sentences well below the Guidelines range.  Plea Agreement ¶ 16 (half the

3  minimum Guidelines range); PSR Sentencing Recommendation, at 1 (one-third).  As a hobbyist

4  whose online purchase was made without nefarious intent or knowledge that he was violating the law,

5  Mr. Abadilla's case falls outside the heartland of cases the Sentencing Commission intended § 2K2.1

6  to cover.  Mitigating circumstances under the 3553(a) factors support a sentence Mr. Abadilla can

7  serve at home, where he is needed to care and provide for his wife.

8          The Court must "impose a sentence sufficient, but not greater than necessary, to comply with

9  the purposes set forth" in 18 U.S.C. § 3553(a).  "The sentencing process is unique for each defendant,

10  and a reviewing court must consider the facts and circumstances of the case before it." *United States*

11  *v. Ahedo-Aguilar*, 809 F. App'x 413, 414 (9th Cir. 2020) (quotations omitted); *Gall v. United States,*

12  552 U.S. 38, 50 (2007) (court "must make an individualized assessment based on the facts

13  presented").  The Court is directed to consider whether mitigating circumstances warrant a variance

14  from the Sentencing Guidelines, including: the history and characteristics of the defendant; any

15  "pertinent policy statement" issued by the Sentencing Commission; the nature and circumstances of

16  the offense; the need for specific and general deterrence; and the need to provide just punishment for

17  the offense, considering the kinds of sentences available.  18 U.S.C. § 3553(a)(1)-(5).

18      **A.      History & Characteristics of the Defendant, and Associated Policy Statements**

19          Mr. Abadilla's lack of criminal history and personal family circumstances suggest leniency

20  under 18 U.S.C. § 3553(a)(1).  The Sentencing Commission has issued policy statements that

21  contemplate leniency for "aberrant behavior" (U.S.S.G. § 5K2.20) and individuals with exceptional

22  family caretaker responsibilities (U.S.S.G. § 5H1.6).[6]  Mr. Abadilla is not permitted to ask for a

23  departure under his plea agreement, but these policy statements are valid considerations under § 3553.

24  //

25  //

26  
27  [6] These policy statements are typically treated as grounds for a departure.  Per the terms of his plea
    agreement, Mr. Abadilla is not seeking a departure. Plea Agreement ¶ 7.  However, the Court may
    still properly consider any pertinent Sentencing Commission policy statements as part of its
28  consideration of a variance under 18 U.S.C. § 3553(a)(5).

-8-

1          1.    <u>No Criminal History</u>

2       Mr. Abadilla's only criminal history is a self-reported incident from when he was a minor.

3 PSR ¶¶ 30-31.  The present offense was a marked and unintentional deviation from Mr. Abadilla's

4 law-abiding record and character.  Most firearm offenders do not share this characteristic.  In a study

5 of federal firearms offenders, the Sentencing Commission found that only 13.6 percent of offenders

6 were assigned zero criminal history points, and nearly one-fifth of firearms offenders (19.9%) accrued

7 more than ten criminal history points.  *See* United States Sentencing Commission, *Recidivism Among*

8 *Federal Firearms Offenders*, p. 16 (June 2019) (hereinafter, "Recidivism Report").[7]

9       The lack of a criminal history is a highly significant consideration in the sentencing process.

10 *See United States v. Paul*, 239 Fed. Appx. 353, 354–55 (9th Cir. 2007) (district court abused its

11 discretion by sentencing defendant to 16 months, but failing to consider the defendant's complete

12 lack of criminal record and the remorse defendant displayed); *see also United States v. Paul ("Paul*

13 *II")*, 561 F.3d 970, 974–75 (9th Cir. 2008) (vacating the *Paul* defendant's sentence a second time

14 when district judge only reduced the defendant's sentence from 16 months to 15 months).

15       The Sentencing Commission's policy statement concerning "aberrant behavior" closely fits

16 Mr. Abadilla's circumstances.  *See* U.S.S.G. § 5K2.20.  The policy recognizes that "exceptional"

17 cases that are "outside the heartland" of the guidelines are worthy of additional leniency where the

18 defendant committed a single criminal transaction that was (1) without significant planning, (2) of

19 limited duration, and (3) represents a marked deviation from an otherwise law-abiding life.  *Id.*; *see*

20 *United States v. Working*, 224 F.3d 1093, 1099–1100 (9th Cir. 2000) (affirming downward departure

21 for "aberrant conduct," a short-lived departure from an otherwise law-abiding life, because the

22 defendant's crime was an isolated incident and he had no prior criminal record); *United States v.*

23 *Arreola-Bretado*, 445 F. Supp. 3d 1154, 1158–59 (S.D. Cal. 2000) (applying policy where defendant

24 posed no danger to the community, was a first time offender, and the offense was "totally out of

25 character for her"); *United States v. Myers*, 353 F. Supp. 2d 1026, 1032 (S.D. Iowa 2005) (sentence

26 of time served and 3-months supervised release for sale of sawed-off shotgun due to "aberrant nature

27

28 _____

[7] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf.

1    of the conduct, the law-abiding character of the defendant, the almost innocent circumstances

2    surrounding [the offense], the Defendant's background, the dependence of his family on his income,

3    the lack of any need for rehabilitation, . . . immediate compliance with authorities during the

4    investigation, and the Defendant's excellent record during pre-trial release").

5        Mr. Abadilla purchased these conversion switches on impulse—he had never even heard of

6    the devices before Wish.com's algorithm recommended them to him.  He also possessed the items

7    for only a matter of days before they were seized by law enforcement officers.

8            2.    Mr. Abadilla's Responsibilities as Caretaker and Provider for His Wife

9        The Sentencing Commission's policy statement concerning family ties and responsibilities,

10   U.S.S.G. § 5H1.6, recognizes that exceptional circumstances may support a lower sentence where (i)

11   the applicable guidelines range will cause a substantial, direct and specific loss of essential caretaking

12   or essential financial support to the defendant's family; (ii) the loss of caretaking or financial support

13   substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant;

14   (iii) and defendant's caretaking or financial support are irreplaceable to the family. U.S.S.G. § 5H1.6,

15   Application Note 1(B); *see United States v. Husein*, 478 F.3d 318, 329 (6th Cir. 2007) ("family

16   circumstances can form the basis of either a Guidelines-authorized departure or a non-Guidelines, §

17   3553(a)-based departure, also known as a variance."); *United States v. Rangel*, 697 F.3d 796 (9th Cir.

18   2012) (district courts, employing factors listed under § 3553(a), have the discretion to weigh family

19   ties and responsibilities as a mitigating factor for sentencing).

20       Mr. Abadilla serves as the sole caretaker for his wife, Maria Veronica, who suffers from

21   "numerous and significant health issues," exacerbated by the global COVID-19 pandemic. PSR ¶¶

22   42-43, 80.  Mrs. Abadilla suffers from

23                                                              . PSR ¶¶ 42-43.  She also suffers from

24

25

26

27                    . *Id.*  Mrs. Abadilla's significant health issues were evident to the Probation Officer

28   even over the course of the short pre-sentencing interview.  *Id.*

-10-

Maria Veronica relies on her husband for much of her day-to-day care. Mr. Abadilla cooks, cleans, does the laundry, runs family errands, and takes his wife to her medical appointments. PSR ¶ 48. Maria Veronica described her husband as "very supportive," "very sweet," and a "wonderful and thoughtful man." *Id.* Should Mr. Abadilla be incarcerated, it would be a significant hardship to his wife. Even prior to the pandemic, she was required to wear a medical mask anytime she left home. PSR ¶ 42. The pandemic has further complicated Mrs. Abadilla's ability to work and tend to needs outside of the home. PSR ¶ 43. She has already been hospitalized for several weeks for concerns related to the pandemic. *Id.* This hardship far exceeds the harm ordinarily experienced by family members when an individual is incarcerated, and supports a downward variance. *See United States v. England*, No. CR 18-61-GF-BMM, 2020 WL 4004477, at *2 (D. Mont. July 15, 2020) (ordering compassionate release to allow care for medically vulnerable child during COVID-19 pandemic).

The Abadilla family is also facing dire financial circumstances. Mr. Abadilla previously supported the family on early withdrawals from the IRA settlement he received when he lost his job. That account is depleted; the final amounts were spent on Mr. Abadilla's defense before he was transferred to court-appointed counsel. The family lives hand-to-mouth, with no funds in checking or savings accounts, and substantial debt. PSR ¶ 58. Mrs. Abadilla has a job as a medical clerk at the Veterans Administration in San Francisco, but is unlikely to be able to sustain long-term employment due to her health issues. PSR ¶ 42. She is only able to work a few days each month due to her severe health problems. PSR ¶¶ 41-43. Even if Mrs. Abadilla did earn her full month's wages, it would not cover the family's monthly expenses. PSR ¶ 58, Note A (showing negative monthly cash flow of $610). Mrs. Abadilla's employer has not provided resources for remote working during the pandemic, so whatever days Mrs. Abadilla *is* able to work must be in person, forcing her to choose between her health as a high-COVID-risk individual and the financial security of the family.

**B.      Nature and Circumstances of the Instant Offense**

Possession of a "machinegun" is unquestionably a serious crime, and the types of parts Mr. Abadilla purchased pose a danger to himself and the community. Mr. Abadilla chose a hobby in pistol building that carries inherent risk and is carefully regulated for good reason. He should have better informed himself of those rules. However, as the Probation Officer concurred, Mr. Abadilla's

-11-

1    intentions were never nefarious.  PSR ¶ 80.  He was a threat to no one.  His crime was one of

2    ignorance, having misplaced his trust in a legitimate website that not only recommended the parts to

3    him, but endorsed them as "Verified by Wish Shoppers" without any warning of their illegality.

4        While Mr. Abadilla does not technically qualify for the Guideline's "sportsman/collector"

5    exception of U.S.S.G. § 2K2.1(b)(2), the spirit of that exception remains. Collectors and hobbyists

6    are a class of defendants whose crimes, where purely that of possession and not unlawful use, are

7    deemed to be less severe.  Though he does not qualify for this specific Guidelines provision, the

8    policy supports a downward variance.  *See* 18 U.S.C. § 3553(a)(2)(A) (court should consider "the

9    need for the sentence imposed to reflect the seriousness of the offense"); 18 U.S.C. § 3553(a)(5)

10   (court should consider any pertinent policy statement).

11       Mr. Abadilla also exhibited exemplary cooperation, voluntarily notifying law enforcement of

12   the switch missed during the search of his home, and turning it in.  PSR ¶ 13; Plea Agreement ¶ 2.

13       **C.    Sentencing Options**

14       The Court has the authority to fashion any sentence that is authorized by statute and in

15   accordance with the factors of 18 U.S.C. § 3553.  18 U.S.C. § 3551.  Home confinement is often

16   structured as a substitute for imprisonment, as a condition of a probationary sentence or as a

17   condition of supervised release.  U.S.S.G. § 5F1.2 (regarding imposition of home detention under

18   the Sentencing Guidelines).  Mr. Abadilla's offense is a Class C felony, which makes him

19   statutorily eligible for a probationary sentence.  18 U.S.C. § 3561(a), (c); PSR ¶ 65.  The Court may

20   impose home confinement as a condition of that sentence.  18 U.S.C. § 3563(b)(19) (statutory

21   discretion to impose home detention as condition of probation).  The court may also impose home

22   detention as a condition of supervised release: such a sentence would credit Mr. Abadilla's time

23   already spent in custody, and impose a further period of supervised release with a condition of home

24   detention.  18 U.S.C. § 3583; U.S.S.G. § 5D1.1 (supervised release following imprisonment);

25   U.S.S.G. § 5C1.1 (discussing use of home detention as a substitute for imprisonment during

26   supervised release).  The Defense respectfully suggests that the Probation Office's recommendation

27   of eight months would be an appropriate period of home confinement.

28

1

### D.    Specific and General Deterrence, and Public Safety

2       A prison sentence would serve little purpose here.  As noted, Mr. Abadilla is a first-time

3   offender who never intended to break the law.  His risk of recidivism is extremely low.  His crime

4   was driven by ignorance rather than intent.  PSR ¶ 17.  *See United States v. Panyard*, No. 07-20037,

5   2009 WL 1099257, at *13 ( E.D. Mich. Apr. 23, 2009) ("Defendant's very low personal likelihood of

6   recidivism supports a reasonable variance."); *United States v. Robinson*, No. 18-CR-00597-RS-1,

7   2020 WL 1982872, at *3 (N.D. Cal. Apr. 27, 2020) (modifying sentence of 15 months to time served

8   for compassionate release in light of worsening health and COVID-19, in part because "[t]his was his

9   first offense, and he presents a very low likelihood of recidivism.").[8]

10      Mr. Abadilla does not need to be imprisoned to protect the public.  He has not hurt anyone, or

11  put anyone in immediate risk of harm. The Probation Office confirmed that he is not viewed as a

12  danger to the community.  PSR Sentencing Recommendation, at 3.

13      Nor is incarceration necessary for general deterrence.  The purpose of societal deterrence is

14  to make clear to others that similar conduct will be treated seriously.  *See* 18 U.S.C. § 3553(a)(2)(B).

15  Mr. Abadilla is a unique offender.  The class of people similar to Mr. Abadilla are curious hobbyists

16  and collectors who are not seeking to break the law—they may be ignorant of the relevant gun control

17  laws, but would avoid breaking those laws as long as they knew better.  Mr. Abadilla's felony

18  conviction, itself, should suffice to educate and deter this class.

19      Home detention will be sufficiently punitive.  The Supreme Court has recognized there is a

20  "substantial restriction of freedom involved in a term of supervised release or probation." *Gall v.*

21  *United States*, 552 U.S. 38, 48 (2007).  Imposing home confinement for a period of eight months

22  only enhances the degree of punishment.  A sentence of home detention would also appropriately

23  weigh the need for punishment with the great "risk of severe illness or death brought on by [the

24

---

25  [8] *See also,* the Sentencing Commission's 2019 study on *Recidivism Among Federal Firearms*
    *Offenders*, which found that recidivism rates were strongly associated with total criminal history
26  points—of which Mr. Abadilla has zero.  *See* Recidivism Report, at 20.  The recidivism rate for
    defendants over the age of 50 was lowest among all age groups, at a rate of less than half that of
27  defendants under the age of 30.  *Id.* at 22.  And offenders who, like Mr. Abadilla, were convicted
    only of "prohibited weapon" charges, and assigned a Base Offense Level of 18, recidivated at the
28  lowest rate of any offenders sentenced under § 2K2.1.  *Id.* at 31-32.

-13-

1    COVID-19] global pandemic," *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y.

2    2020); *United States v. Mishler*, No. 19-cr-00105-RS-2, 2020 WL 3791590, at *2 (N.D. Cal. July 7,

3    2020) ("The dangers which COVID-19 presents to incarcerated individuals are, at this point,

4    blatantly obvious.").

5    **V.    <u>CONCLUSION</u>**

6         For the reasons stated above, Mr. Abadilla respectfully requests that the Court accept the

7    Probation Office's recommendation of an eight month sentence but impose that sentence to be served

8    in home detention as a condition of probation or supervised release.

9                                         Respectfully Submitted,

10

11   DATED: May 3, 2021                   VINSON & ELKINS LLP

12

13                                        _____
                                          Christopher W. James

14                                        Attorneys for Defendant
                                          MICHAEL SANDY ABADILLA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        -14-

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served May 3, 2021, with a copy of this document via the Court's CM/ECF system.  I certify that all parties in this case are represented by counsel who are CM/ECF participants.

DATED: May 3, 2021                              VINSON & ELKINS LLP

                                                                 /s/ Christopher W. James
                                                                 Christopher W. James
                                                                 Attorneys for Defendant
                                                                 MICHAEL SANDY ABADILLA

-15-